UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN L. WESLOWSKI,

                                    Plaintiff,

         -v-

PATRICIA ZUGIBE, JEFFREY J. FORTUNATO,
and COUNTY OF ROCKLAND,

                                    Defendants.

Case No. 12-CV-8755 (KMK)

OPINION AND ORDER

Appearances:

John Louis Weslowski, Esq.
Schenectady, NY
*Pro se Plaintiff*

Robert Benjamin Weissman
Saretsky Katz Dranoff & Glass LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

         Plaintiff John L. Weslowski ("Plaintiff") brought this Action against defendants Patricia

Zugibe ("Zugibe") and Jeffrey J. Fortunato ("Fortunato") in their individual and official

capacities, and against the County of Rockland (the "County") (collectively, "Defendants"),

seeking relief under federal and state law for claims arising out of Plaintiff's allegedly wrongful

termination in the fall of 2009.  Before the Court is Defendants' Motion To Dismiss the

Complaint on all counts.  (*See* Notice of Mot. ("Mot.") (Dkt. No. 18).)  For the reasons stated

below, the Court grants the Motion in full without prejudice to Plaintiff to amend.

I.  Background

A.  Factual History

The following facts are drawn from Plaintiff's Complaint and are taken as true for the purposes of resolving the instant Motion.

In June 2003, Plaintiff began employment for the County as a full-time Assistant County Attorney.  (*See* Compl. ¶ 9 (Dkt. No. 1).)  Approximately six months later, Plaintiff was promoted to Senior Assistant County Attorney, a position he held until the events giving rise to this Action.  (*See id.* ¶¶ 11–12.)  In that position, Plaintiff worked under the supervision of Zugibe, County Attorney, and Fortunato, Deputy County Attorney.  (*See id.* ¶¶ 3–4.)  At some point before 2009, Zugibe and Fortunato came to know that Plaintiff is gay.  (*See id.* ¶ 25(a).)  Later, in May 2009, Zugibe and Fortunato "reprimanded" Plaintiff for March 2009 conduct in violation of County internet-usage policies—namely, Plaintiff's use of County computers and internet services to view "perfectly legal gay male sexual content."  (*Id.* ¶¶ 29(d), 29(d)(1).)

In mid-2009, Plaintiff was assigned to review an application to receive County funds pursuant to a program funded by the federal government.  (*See id.* ¶¶ 23(a)–(e).)  During his review of the proposed contract, Plaintiff determined, *inter alia*, that "the proposed contractor was itself neither an incorporated entity, nor any other legal entity under New York law, nor was the 'President' [of the entity] authorized to act on behalf of anyone but himself."  (*Id.* ¶ 23(f).)  Plaintiff thereafter informed his superiors and the proposed contractor that he would refuse to approve the proposed contract on these grounds, and he made known his general intention otherwise to prevent the County from agreeing to the proposed contract.  (*See id.* ¶ 23(i).)

In response, the "President" of the proposed contractor, "frustrated by [an] unexpected administrative obstacle," "made clear to [Defendants] the political clout that he and his highly

2

visible unincorporated association could wield during . . . a fiercely and closely contested [local] election." (*Id.* ¶ 24.) Subsequently, in August 2009, Zugibe and Fortunato decided to terminate Plaintiff and "deliberately and maliciously" took steps to gather evidence sufficient to establish cause for the termination—including emails, work documents, and evidence of his March 2009 internet-policy violations—while "conceal[ing] those steps from [Plaintiff]." (*See id.* ¶¶ 29(b), 29(c).) Additionally, on October 16, 2009, Zugibe instructed Plaintiff to transfer the proposed-contract assignment to a colleague, who revised the contract and took steps to have it executed. (*See id.* ¶¶ 26(a), 26(b)(1).) The County ultimately signed and fully executed the contract on October 27, 2009. (*See id.* ¶ 28.)

On November 24, 2009, Defendants Zugibe and Fortunato "summoned [Plaintiff] into Zugibe's office," "told [Plaintiff] that he would not be invited to be 'part of the team,'" and informed him "that the only question was whether [Zugibe] would dismiss [Plaintiff] for cause at that time or . . . allow [Plaintiff] to voluntarily resign." (*Id.* ¶¶ 30, 30(a).) In the meeting, Zugibe specifically referenced Plaintiff's recent refusal to approve the proposed contract, his March 2009 violations of the internet-usage policy, and several other examples of allegedly sub-par performance. (*See id.* ¶¶ 30(b).) Furthermore, to induce Plaintiff to resign voluntarily, Fortunato informed Plaintiff that he would forfeit his right to thousands of dollars in accumulated, unused vacation and longevity leave if he were terminated for cause. (*See id.* ¶ 30(c).) Plaintiff further alleges that Defendants "promised [him] that he would not lose that unused accumulated leave, but rather that he would be paid that leave in full," if he voluntarily resigned. (*Id.* ¶ 38(a).) In reliance on that promise, Plaintiff agreed to resign voluntarily on November 24, and "by the end of the day [he] delivered his signed resignation letter to Fortunato," even though "it was not [his] intention to voluntarily resign." (*Id.* ¶¶ 30(e), 38(b).)

With Zugibe's consent, and per the terms of his resignation letter, Plaintiff's resignation did not take effect until December 4, 2009.  (*See id.* ¶ 30(d); Decl. of Robert B. Weissman ("Decl.") (Dkt. No. 19), Ex. C (resignation letter).)[1]  At some time on or after his last day, "County paid [Plaintiff] for . . . 440.00" unused leave hours.  (*See* Compl. ¶ 31(b)(3).)  But according to Plaintiff, he had accumulated at least 663.50 hours.[2]  (*See id.*)  Thus, at Plaintiff's hourly wage of $43.527, Defendants refused to pay Plaintiff $9,728.28 of the money that they promised to pay him on November 24, 2009, when he agreed to resign voluntarily in reliance on that promise.  (*See id.*)

B.  Procedural History

Plaintiff filed this Complaint on December 3, 2012.  (*See id.* at 47.)  The Complaint includes five causes of action arising under federal law, including three causes of action under 42 U.S.C. § 1983, alleging that Defendants' secretive plan to terminate him, and the decision to terminate him based, in part, on his use of the Internet to view "gay male sexual content," (*id.* ¶ 29(d)(1)), violated his First Amendment right to free speech, (*see id.* ¶ 35), his Fourteenth Amendment right to equal protection, (*see id.* ¶¶ 32–33), and his Fourteenth Amendment right to procedural due process, (*see id.* ¶ 36); one cause of action under 42 U.S.C. § 1985(3), alleging that Defendants conspired to deprive him of those rights, (*see id.* ¶ 37); and one cause of action

---

[1] Because Plaintiff's resignation letter was referenced in and is integral to the Complaint, the Court will consider it in deciding the Motion To Dismiss.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (noting that, in resolving a motion to dismiss, a court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or document incorporated in it by reference," and any "document . . . not incorporated by reference . . . where the complaint relies heavily upon its terms and effect, . . . render[ing] the document 'integral' to the complaint" (some internal quotation marks omitted)).

[2] Plaintiff also alleges that he may have accumulated as many as 945.50 total unpaid-leave hours, the "permissible maximum" under his employment contract.  (*See* Compl. ¶ 31(b)(3).)

under the False Claims Act—specifically, 31 U.S.C. § 3730(h)—alleging that Defendants'
decision to terminate him constituted unlawful retaliation in response to his attempt to stop a
False Claims Act violation, (*see id.* ¶¶ 21–30).   The Complaint also includes four causes of
action arising under state law, including one cause of action alleging that Defendants' decision to
terminate him based on his sexual orientation violated N.Y. Executive Law § 296(1)(a), (*see id.*
¶ 34); one cause of action alleging that the termination and the refusal to reimburse him for all of
his unused vacation and longevity leave breached his employment contract, (*see id.* ¶ 31); one
cause of action alleging that Defendants' refusal to reimburse him for all of his unused vacation
and longevity leave breached an enforceable promise under the theory of promissory estoppel,
(*see id.* ¶ 38); and one cause of action similarly alleging that the refusal to reimburse Plaintiff for
his unused vacation and longevity leave as well as his unused sick leave constituted unjust
enrichment, (*see id.* ¶¶ 39–40).

 The Court held a premotion Conference on April 12, 2013, and set a briefing schedule for
Defendants' Motion To Dismiss.  (*See* Dkt. No. 15.)  Pursuant to that schedule, Defendants filed
the instant Motion on May 17, 2013, (*see* Mot.); Plaintiff filed an Opposition Memorandum on
June 28, 2013, (*see* Mem. of Law in Opp. to Defs.' Mot. To Dismiss Pursuant to Fed. R. Civ. P.
12(b)(6) ("Opp.") (Dkt. No. 22)); and Defendants filed a Reply Memorandum on July 12, 2013,
(*see* Reply Mem. of Law in Supp. of Defs.' Mot. To Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)
(Dkt. No. 26)).

## II.  Discussion

### A.  Standard of Review

 The Supreme Court has held that although a complaint "does not need detailed factual
allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of

his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (citations omitted).  Instead, the Court has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563.  A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

In considering Defendants' Motion To Dismiss, the Court is required to consider as true the factual allegations contained in the Complaint.  *See Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (internal quotation marks omitted)); *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) (same).  Moreover, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to

matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

The Court notes that Plaintiff is proceeding pro se. In general, this would require the court to construe his pleadings liberally and "interpret them to raise the strongest arguments that they suggest." *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009) (internal quotation marks omitted); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006). However, because Plaintiff is a licensed attorney, the liberal-construction rule does not necessarily apply to his pleadings. *See Larsen v. JBC Legal Grp., P.C.*, 533 F. Supp. 2d 290, 295 n.2 (E.D.N.Y. 2008) (declining to apply "the liberality normally accorded *pro se* litigants" and holding the *pro se* plaintiff "to the same standards as other attorneys appearing before the court" (internal quotation marks omitted)); *see also Sembler v. Attention Funding Trust*, No. 07-CV-2493, 2009 WL 2883049, at *1 (E.D.N.Y. Sept. 3, 2009) (because "[p]laintiff [was] an admitted attorney, . . . . the Court [did] not construe plaintiff's pleadings liberally to raise the strongest arguments they suggest" (internal quotation marks omitted)).

B. Analysis

1. False Claims Act Claim

Plaintiff first claims that Defendants "'discharged'" him "'because of lawful acts done . . . to stop [one] or more violations of [the False Claims Act ("FCA")].'" (Compl. ¶ 21 (quoting 31 U.S.C. § 3730(h)(1)).) Plaintiff's claim arises from his denial of an application for County funds wherein, Plaintiff alleges, the applicant made false claims to procure funds provided to the County by the federal government. (*See id.* ¶¶ 23, 23(b), 23(f), 23(i).) Plaintiff alleges that, subsequent to his denial of the application, Defendants took "a series of active, systematic steps

. . . to retaliate against [Plaintiff], . . . to conceal those steps from [him]," and ultimately to terminate him.  (*See id.* ¶¶ 29(a)–(b), 30.)  Plaintiff's claim thus arises under the provision of the FCA providing "relief from retaliatory actions" taken in response to his lawful efforts to expose a false claim.  *See* 31 U.S.C. § 3730(h) (alterations omitted).

Defendants argue that this claim is untimely because Plaintiff brought it outside of the three-year limitations period applicable to FCA claims.  To resolve Defendants' argument, the Court must decide (a) whether to apply the limitations period specified in the FCA to Plaintiff's claim, or whether to borrow the statute of limitations from state law; (b) whether Plaintiff's claim was timely under that limitations period; if not, (c) whether to apply equitable tolling to make Plaintiff's claim timely; and, if not, (d) whether the limitations period was otherwise tolled so as to make Plaintiff's claim timely.

### a.  Applicable Limitations Period

The Complaint alleges that the conduct giving rise to Plaintiff's FCA claim occurred in late 2009.  (*See* Compl. ¶ 30.)  At that time, the FCA did not specify the time within which a plaintiff could bring a claim for retaliation under § 3730(h).  *See* 31 U.S.C. § 3730(h) (2006).  In this context, the Supreme Court previously had held that "[t]he most closely analogous state statute of limitations . . . applie[d]" to claims brought under § 3730(h).  *See Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 422 (2005).  Accordingly, courts in this District previously applied to § 3730(h) claims a three-year limitations period borrowed from New York's residuary statute of limitations for personal-injury claims.  *See, e.g.*, *U.S. ex rel. Smith v. N.Y. Presbyterian Hosp.*, No. 06-CV-4056, 2007 WL 2142312, at *12 (S.D.N.Y. July 18, 2007); *McKenna on Behalf of U.S. v. Senior Life Mgmt., Inc.*, 429 F. Supp. 2d 695, 700 (S.D.N.Y. 2006).

8

In July 2010, after the events giving rise to Plaintiff's claim but before Plaintiff filed his Complaint, Congress amended § 3730(h) and thereby added an explicit three-year limitations period to § 3730(h) claims. *See* Dodd–Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1079A, 124 Stat. 1376, 2079 (2010) (codified as amended at 31 U.S.C. § 3730(h)(3)). Therefore, at the time Plaintiff filed his Complaint, the statute provided that "[a] civil action under [§ 3730(h)] may not be brought more than [three] years after the date when the retaliation occurred." 31 U.S.C. § 3730(h)(3).

The question of whether a newly enacted limitations-period provision applies to a claim based on pre-enactment events but alleged in a post-enactment filing generally does not require the Court to determine whether to apply the newly enacted provision retroactively. *See Vernon v. Cassadaga Valley Cent. Sch. Dist.*, 49 F.3d 886, 889 (2d Cir. 1995) ("[A]pplying a new or amended statute of limitations to bar a cause of action filed after its enactment, but arising out of events that predate its enactment, generally is not a retroactive application of the statute."). This is specifically true here, where "the conduct to which [the newly enacted limitations period] refers is the plaintiff's conduct relating to the filing of the claim and not the defendant's conduct giving rise to the claim." *Walsche v. First Investors Corp.*, 981 F.2d 649, 654 (2d Cir. 1992); *see also Vernon*, 49 F.3d at 889 (noting that retroactive application does not occur where "the statute [of limitations] is applied to conduct that occurs after the statute's enactment—[the] plaintiff's filing of the complaint—not the defendant's allegedly unlawful acts"). Although in certain circumstances a court's application of a newly enacted limitations period to pre-enactment claims might be "impermissible," *see Ross v. Artuz*, 150 F.3d 97, 100 (2d Cir. 1998) ("It is . . . impermissible for a newly enacted or shortened statute of limitations to extinguish claims immediately upon the statute's enactment."), this case does not present such a circumstance

because the pre-enactment and post-enactment limitations periods are both three-years long, and Plaintiff has not argued that application of the newly enacted would otherwise affect his substantive rights to bring an FCA retaliation claim.  *See Vernon*, 49 F.3d at 891 (distinguishing statutes of limitation, which are "procedural matter[s]" that may be applied to claims arising out of pre-enactment events, from "statutory provisions that affect substantive rights," which might not be so applied).  The Court therefore concludes that the three-year limitations period added to the FCA in 2010 applies to Plaintiff's FCA claim, which Plaintiff brought in 2012.  *Cf. United States v. Wells Fargo Bank, N.A.*, — F. Supp. 2d —, 2013 WL 5312564, at *11 (S.D.N.Y. Sept. 24, 2013) (concluding, in the context of an FCA claim brought under § 3730(b), that "[t]he applicable statute of limitations governing a lawsuit is . . . that which is in effect at the time the lawsuit is filed" (citing *Vernon*, 49 F.3d at 990; *Walsche*, 981 F. 2d at 654)).

b.  Timeliness

Under § 3730(h)(3), an action brought under § 3730(h) accrues "when the retaliation occurred."  31 U.S.C. § 3730(h)(3); *cf. Graham Cnty. Soil & Water Conservation Dist.*, 545 U.S. at 419 (holding, before Congress added subsection (3) to § 3730(h) in 2009, that "the cause of action accrues . . . in retaliation actions[] when the retaliatory action occurs.").  Here, Plaintiff alleges that, on November 24, 2009, "without any notice whatsoever, Zugibe and Fortunado summoned [him] into Zugibe's office . . . . [and] told [Plaintiff] that he would not be invited to be 'part of the team' and that the only question was whether [Zugibe] would dismiss [Plaintiff] for cause at that time or . . . allow [Plaintiff] to voluntarily resign."  (Compl. ¶¶ 30, 30(a).)  Plaintiff filed his Complaint on December 3, 2012, (*see id.* at 47 (filing date)), which is more than three years after November 24, 2009—the date he was notified of his termination and the

10

day he submitted his resignation, and thus the date "when the retaliation occurred." 31 U.S.C.
§ 3730(h)(3).  His claims are thus time-barred.

Plaintiff makes two arguments against dismissal on statute-of-limitations grounds.  First,
he argues that his November 24 resignation letter was "conditional," and thus he had no notice of
the discrimination—and his claim therefore did not accrue—until the last day of his employment,
i.e., December 4.  In his words, "a letter's 'conditional nature,' as well as any 'assurances' built
into it, prevents a letter such as [Plaintiff's] from serving as the 'definite notice of termination'
necessary to start the running of the statute of limitations."  (Opp. 11 (footnote omitted).)  In
support of this argument, Plaintiff cites *Palummo v. St. Vincent's Med. Ctr.*, 4 Fed. App'x 99 (2d
Cir. 2001), wherein the Second Circuit held that an employer's letter did not constitute "definite
notice of termination" to the plaintiff because it notified her of the *possibility* of termination if
she failed to meet either of two conditions.  *Id.* at 100, 102. [3]  But Plaintiff mistakenly conflates
that case with his own.  Although both cases involve a "letter," here the "definite notice of
termination" occurred when, as Plaintiff alleges, Zugibe "told [him] that he would not be invited
to be 'part of the team.'"  (Compl. ¶ 30(a).)  Moreover, after being told that "the only question
was whether [Zugibe] would dismiss [Plaintiff] for cause . . . or . . . allow [Plaintiff] to
voluntarily resign," (*id.*), Plaintiff signed a resignation letter on November 24, indicating his
understanding that there was no question that he would be terminated, (*id.* ¶ 30(e)).  The Court
finds nothing conditional about the November 24 termination *notice*, even if the effective date of
the resignation was December 4, and his claim therefore began to accrue on that date.  *See*

---

[3] The Court notes that, under the Local Rules for the Court of Appeals for the Second
Circuit, summary orders do not have precedential effect, and parties may not cite a summary
order issued prior to January 1, 2007, except in two circumstances, neither of which is present
here. *See* 2d Cir. R. 32.1.1(a), (b)(2).

*Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) ("[Plaintiffs] were notified, when they received their letters, that a final decision had been made to terminate their appointments. The fact that they were afforded reasonable notice cannot extend the period within which suit must be filed."); *Shockley v. Vt. State Colls.*, 793 F.2d 478, 481–82 (2d Cir. 1986) (noting that, "[g]enerally, the timeliness of a discrimination claim is measured from the date the claimant receives notice of the allegedly discriminatory act, not from the date the decision takes effect," and holding that a "letter of non-reappointment was a 'final' notice of termination").

Plaintiff's second argument relies on his allegation of an act that occurred after December 4, 2009, and therefore within the limitations period. Specifically, Plaintiff alleges that at the November 24 meeting, Zugibe and Fortunato promised him that he would be paid for his unused accumulated leave in full, but then later "refused, neglected to pay, and failed [to pay] . . . that entire accumulated leave amount to [Plaintiff] as so promised." (Compl. ¶ 39.) He further alleges that, on December 4, his "accumulated leave account . . . stood . . . at 663.50 hours . . . , but County paid [him] for only 440.00 of those 663.50 hours." (*Id.* ¶ 31(b)(3).) Notably, Plaintiff alleges this specific claim only in Counts 2, 8, and 9 of the Complaint, which allege, respectively, breach-of-contract, promissory-estoppel, and unjust-enrichment claims. (*See id.* ¶¶ 31, 38, 39–40; *see also id.* ¶ 13(b) ("From November 24, 2009 through December 4, 2009, [Plaintiff] . . . was induced by and justifiably and reasonably relied on promises and representations made on November 24, 2009 . . . that if he . . . submitted his resignation . . . [he] would be entitled under [his employment contract] to, and County would in fact pay [him], all of the leave (other than sick leave) accumulated and unused by him as [of] the effective date of his resignation (calculated as set forth in the Contract, Promissory Estoppel, and Unjust Enrichment

Counts below); induced by those broken promises and false representations, County was unjustly enriched.").)

In his Opposition to Defendants' Motion, Plaintiff argues that the post-December 4 refusal to pay the entirety of his unpaid leave was a retaliatory act in line with previous retaliatory acts, making all of his claims timely under the "continuing violation" doctrine. Specifically, he argues that the November 24 meeting "was only one benchmark moment in a series of actionable acts that came together only on and after December 4, 2009, to form a ripe and complete cause of action," (Opp. 10), and that "[his] causes of action occurred no earlier than the post-December 4, 2009 payday when he learned that Zugibe and Fortunato had effectively succeeded in their scheme both to swindle him . . . out of his job, as well as succeeded in having the County fraudulently keep the thousands of dollars of promised accumulated leave," (*id.* at 12; *see also id.* at 9–10 ("Nor was November 24, 2009 the day [Plaintiff] could first have successfully maintained a suit to recover money damages for falsely promised but unpaid leave: that claim became ripe (accrued) no earlier than the post-December 4, 2009 pay day when his final paycheck let him know that the County had filched the promised leave payout.")).

Although the Second Circuit has applied the "continuing violation" doctrine in certain circumstances to extend a claim's accrual date, *see Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999) (analyzing workplace-discrimination-claim accrual dates under the continuing-violation doctrine), that doctrine, "is heavily disfavored in the Second Circuit and courts have been loath to apply it absent a showing of compelling circumstances." *Hernandez v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234, 2013 WL 6388654, at *5 (E.D.N.Y. Dec. 6, 2013) (internal quotation marks omitted); *Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 564

(S.D.N.Y. 2012) ("The continuing violations doctrine is generally viewed with disfavor in the Second Circuit and should be applied only on a showing of compelling circumstances." (internal quotation marks omitted)); *Sloth v. Constellation Brands, Inc.*, 883 F. Supp. 2d 359, 370 (W.D.N.Y. 2012) ("[T]he 'continuing violation' doctrine is strongly disfavored by courts in this Circuit." (internal quotation marks omitted)).  In the context of FCA retaliation claims, at least one court in the Second Circuit has analyzed an FCA retaliation claim under the continuing-violation doctrine, but it ultimately found that the doctrine did not bring "discrete acts that occurred [more than three years before the plaintiff filed his complaint]" within the limitations period.  *See Pakter v. N.Y.C. Dep't of Educ.*, No. 08-CV-7673, 2010 WL 1141128, at *6 (S.D.N.Y. Mar. 22, 2010).  This comports with the Second Circuit's general view that "[c]haracterizing [a] defendants' separate wrongful acts as having been committed in furtherance of a conspiracy or as a single series of interlocking events does not postpone accrual of claims based on individual wrongful acts.  *Singleton v. City of New York*, 632 F.2d 185, 192 (2d Cir. 1980) (internal quotation marks omitted), *overruled on other grounds by Roesch v. Otarola*, 980 F.2d 850, 853–54 (2d Cir. 1992), *as recognized in Beberaggi v. N.Y.C. Transit Auth.*, No. 93-CV-1737, 1994 WL 75144, at *5 (S.D.N.Y. Mar. 9, 1994).  As the Second Circuit has explained,

> [t]he crucial time for accrual purposes is when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action. To permit him to wait and toll the running of the statute simply by asserting that a series of separate wrongs were committed pursuant to a conspiracy would be to enable him to defeat the purpose of the time-bar, which is to preclude the resuscitation of stale claims. . . .  The existence of a conspiracy does not postpone the accrual of causes of action arising out of the conspirators' separate wrongs.  It is the wrongful act, not the conspiracy, which is actionable . . . .

*Id.*; *cf. Washington v. Cnty. of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) ("[W]e reject plaintiffs' contention that this series of separate acts should be characterized as an ongoing policy of continuous discrimination sufficient to toll the applicable statute of limitations.");

14

*Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907–08 (2d Cir. 1997) ("A continuing violation is not established merely because an employee continues to feel the effects of a discriminatory act on the part of the employer.  To hold otherwise would render meaningless the time limitations imposed on discrimination actions.").  The Court therefore holds that, even if the continuing-violation doctrine applied to Plaintiff's FCA retaliation claim, that claim is untimely with respect to all of the events the Complaint alleges occurred before December 3, 2009.  This includes Plaintiff's termination, which the Complaint alleges occurred on November 24, 2009. (*See* Compl. ¶ 30.)  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (noting that "termination" is a "[d]iscrete act" for purposes of the continuing-violation doctrine).

　　　This does not end the matter, however, because Plaintiff has identified one allegedly retaliatory act that occurred within the limitations period.  Specifically, he alleges in his Memorandum of Law that "depriv[ing] [Plaintiff] of his earned and promised accumulated leave" after December 4 constituted retaliation under the FCA.  (Opp. 18.)  However, Plaintiff makes this allegation only in his Memorandum, and not in his Complaint with respect to his FCA claim.[4]  *See Goldberg v. Danaher*, 599 F.3d 181, 183 (2d Cir. 2010) ("[A] motion under Rule 12(b)(6) presents a pure legal question[] based on allegations contained within the four corners of the complaint . . . ."); *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 516 (S.D.N.Y. 2005) ("It is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs.").  Additionally, even if the refusal to pay him was retaliatory, this allegation would not state an FCA retaliation claim because, as plead in the Complaint, it occurred after Plaintiff was terminated.  *See* 31 U.S.C. § 3730(h)(1) (providing a cause of action

---

[4] As previously discussed, Plaintiff made the unpaid-benefits allegations solely within his breach-of-contract, promissory-estoppel, and unjust-enrichment claims.  (*See* Compl. ¶¶ 31, 38–40.)

for retaliation only against an "employee, contractor, or agent"); *see also Master v. LHC Grp. Inc.*, No. 07-CV-1117, 2013 WL 786357, at *7 (W.D. La. Mar. 1, 2013) (holding that "the FCA does not provide a remedy for post-employment retaliation," noting that "all courts to have addressed this issue have" agreed with this holding, and collecting cases).  The Court therefore dismisses Plaintiff's FCA claim in its entirety because the Complaint alleges conduct that occurred outside the FCA limitations period and, for conduct within the period, fails to state an FCA retaliation claim.

### c.  Equitable Tolling

In portions of his Memorandum of Law, Plaintiff makes passing references to an equitable-tolling argument.  (*See* Opp. 2 (asking the Court to "take judicial notice" of certain records "for establishing (*if needed*) grounds for equitable tolling" (emphasis added)); *id.* at 5 (referencing, in general, "grounds for equitable tolling"); *id.* at 13 n.23 ("Equitable tolling of the statute of limitations is discussed below . . . .").)  But Plaintiff never actually makes the argument.  Instead, he claims that, "since June 2010[, Defendant County] has stubbornly resisted [his] diligent and sustained Freedom of Information Law (FOIL) requests and resort to [state-law] procedures to obtain information to which he is legally entitled, and which is relevant to, [and] crucial for, developing the factual allegations of the pleadings . . . ." (*Id.* at 2.)  He also claims that "[D]efendants secreted meaningful documentation . . . until their attorney . . . on April 29, 2010, . . . disclosed to [Plaintiff] for the first time crucial documentation . . . ." (*Id.* at 13 n.23.)

Courts in the Second Circuit "will apply the equitable tolling doctrine 'as a matter of fairness' where a plaintiff has been 'prevented in some extraordinary way from exercising his rights.'"  *Pearl v. City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2002) (quoting *Miller v. Int'l Tel.*

*& Tel. Corp.*, 755 F.2d 20, 24 (2d Cir. 1985)).  But Plaintiff's allegations are far from

extraordinary.  Plaintiff never explains why any of these documents is crucial to his Complaint,

and he also never explains why, after he received at least one batch of "crucial" documents in

April 2010, he was not able to file his Complaint by November 24, 2012 (over thirty months

later), even though he was able to file it approximately two weeks after that deadline.  *See Koch*

*v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) ("Reasonable diligence is a prerequisite

to the applicability of equitable tolling."); *Harper v. Ercole*, 648 F.3d 132, 139 (2d Cir. 2011)

("This court has repeatedly stated that a party seeking equitable tolling must show diligent

pursuit of his claim throughout the period he seeks to toll." (emphasis removed) (internal

quotation marks omitted)).  The Court thus rejects Plaintiff's equitable-tolling argument as

applied to his FCA claim.

### d.  Statutory Tolling

Based on the Complaint and the arguments Plaintiff raised in his Memorandum of Law,

the foregoing analysis is sufficient to support the Court's decision to grant Defendants' Motion

with respect to Plaintiff's FCA claim.  However, approximately seven months after Plaintiff filed

his Memorandum, he filed the first of two letters raising additional arguments against

Defendants' statute-of-limitations claim.  (*See* Dkt. No. 28 (letter from Plaintiff to Court (Jan.

27, 2014)); Dkt. No. 32 (letter from Plaintiff to Court (Feb. 19, 2014)).)  Plaintiff did not receive

prior permission to submit these letters—which the Court construes to be Sur-reply

Memoranda—and thus the Court notes that, pursuant to the Motion Scheduling Order, it is under

no obligation to accept them.[5]  (*See* Dkt. No. 15 ("Sur-reply papers will not be accepted unless

---

[5] As the Court informed Plaintiff after receiving his second letter, "[o]nce a schedule is
set, and an issue is fully-submitted, the Parties are to refrain from submitting additional

prior permission of the Court is given.").)  However, nothing in these letters changes the outcome.

In his first Sur-reply Memorandum, Plaintiff, for the first time in this litigation, raised the argument that any limitations period derived from New York's CPLR § 201 was tolled from October 26, 2012, through December 25, 2012, pursuant to two Executive Orders in which the Governor of New York suspended certain state statutes of limitation in response to the disaster emergency he declared in the wake of Hurricane Sandy.  (*See* Dkt. No. 28 (citing N.Y. Comp. Codes R. & Regs. tit. IX, § 8.52 (2012); *id.* tit. IX, § 8.81).)  In his second Sur-reply Memorandum, unlike in his first Sur-reply Memorandum—and, again, for the first time in this litigation—Plaintiff specifically applied this argument to his FCA claim, arguing that the Court should apply the borrowed (and thus, arguably, tolled) state statute of limitations to his FCA claim because the claim accrued prior to Congress's 2010 enactment of the FCA's statutory limitations period.  (*See* Dkt. No. 32 at unnumbered 1–2.)  For reasons the Court has already explained, the Court rejects this argument and holds that the FCA's statutory limitations period applies to Plaintiff's claim.

In the alternative, however, Plaintiff raised another argument—yet again, for the first time in this litigation—that his FCA claim is timely even under the FCA's statutory limitations period.  Before addressing Plaintiff's argument, the Court will quote it in its entirety:

> Were this Court . . . to entertain defendants' argument that the federal statute of limitations . . . enacted in 2010, rather than a "borrowed" New York statute of limitations, does after all retroactively apply to the 2009 activity alleged in this case, the Wartime Suspension of Limitations Act (18 USC §3287 [sic]), would, in light of the United States' current wars in Iraq and Afghanistan, seem to have tolled 31 USC §3730(h)(3) [sic] until those wars shall eventually have been terminated.

_____

letters/briefs.  While [Plaintiff] is pro se, he also is an attorney."  (Dkt. No. 32 (memo-endorsed letter).)

(*Id.* at unnumbered 2 (emphasis removed).)  Plaintiff also cited, without explanation, two cases in support of his argument.  (*See id.* (citing *U.S. ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 177–81 (4th Cir. 2013); *U.S. ex rel. Paulos v. Stryker Corp.*, No. 11-CV-41, 2013 WL 2666346, at *15 (W.D. Mo. June 12, 2013)).)  In these cases, the Fourth Circuit and a district court in the Western District of Missouri held that the Wartime Suspension of Limitations Act ("WSLA"), 18 U.S.C. § 3287, operated to suspend the statute of limitations as applied to an FCA claim brought by a relator on behalf of the U.S. government in light of the wars in Iraq and Afghanistan.  *See Halliburton*, 710 F.3d at 179–81 (holding that the WSLA tolls the limitations period for "relator-initiated claims" under the FCA, that it does so "for a specified and bounded time while the country is at war," and that it did so specifically from October 11, 2002, when Congress signed the Authorization for the Use of Military Force against Iraq (AUMF), until the end of the conflict in Iraq); *Stryker Corp.*, 2013 WL 2666346, at *15 (holding that the WSLA tolled a relator-initiated claim under the FCA from September 2001, when "Congress authorized the President to use military force in Afghanistan," until the present, because "United States troops are still in that country").  Although Defendants responded to Plaintiff's final Sur-reply Memorandum, they did not address his WSLA argument.  (*See* Dkt. No. 31 (letter from Robert B. Weissman to Court (Feb. 25, 2014)).)

The Court is hesitant to address an argument that no Party has had an opportunity to brief fully.  This is particularly true where Plaintiff's defense of the argument is weak, (*see* Dkt. No. 32 at unnumbered 2 (arguing that the WSLA "would . . . seem to have tolled" the limitations period for his claim)), and where accepting his argument would require a novel interpretation of the WSLA.  Indeed, although Plaintiff cited two cases that applied the WSLA to relator-initiated FCA actions, he did not cite a case—and the Court cannot find one—that has applied it to FCA

retaliation actions.  Nevertheless, based on the Court's own analysis of the WSLA, it holds that that statute does not apply to Plaintiff's FCA retaliation claim.

The WSLA provides that,

[w]hen the United States is at war or Congress has enacted a specific authorization for the use of the Armed Forces, as described in [50 U.S.C. § 1544(b)], the running of any statute of limitations applicable to any offense (1) involving fraud or attempted fraud against the United States or any agency thereof in any manner, whether by conspiracy or not, or (2) committed in connection with the acquisition, care, handling, custody, control or disposition of any real or personal property of the United States, or (3) committed in connection with the negotiation, procurement, award, performance, payment for, interim financing, cancelation, or other termination or settlement, of any contract, subcontract, or purchase order which is connected with or related to the prosecution of the war or directly connected with or related to the authorized use of the Armed Forces, or with any disposition of termination inventory by any war contractor or Government agency, shall be suspended until 5 years after the termination of hostilities as proclaimed by a Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress.  For purposes of applying such definitions in this section, the term 'war' includes a specific authorization for the use of the Armed Forces, as described in [50 U.S.C. § 1544(b)].

18 U.S.C. § 3287.  Although the statute applies to three categories of "offenses," Plaintiff does not specify which one he believes applies to his claim.  Because it would seem that the second and third categories do not apply to Plaintiff's claim, the Court construes Plaintiff's argument to fall under the first category, which applies, in relevant part, to claims "involving fraud or attempted fraud against the United States." *Id.*[6]

"The WSLA was enacted in 1942 to extend the time for prosecution to bring charges related to criminal fraud offenses against the United States during times of war." *Halliburton*, 710 F.3d at 177.  In cases interpreting the WSLA as applied to criminal prosecutions that arose during and after World War II, the Supreme Court held that the Act was "limited strictly to

---

[6] Because the Court rejects Plaintiff's argument on this ground, it need not decide whether any other of the WSLA's requirements have been satisfied.

offenses in which defrauding or attempting to defraud the United States is an essential ingredient of the offense charged." *Bridges v. United States*, 346 U.S. 209, 221 (1953); *see also Wells Fargo Bank*, 2013 WL 5312564, at *12 ("Under *Bridges*, the WSLA only applies to offenses: (1) of a pecuniary nature or of a nature concerning property; (2) in which defrauding or attempting to defraud the United States is an essential ingredient of the offense charged." (internal quotation marks and citations omitted)).   Under this standard, the Supreme Court later held that the WSLA applied to criminal offenses brought under the FCA provision criminalizing "any claim upon . . . the United States" where the claimant "kn[ew] [the] claim to be false, fictitious, or fraudulent." *United States v. Grainger*, 346 U.S. 235, 244 (1953) (internal quotation marks omitted).   Courts in subsequent cases have found that the WSLA applies to civil claims involving fraud. *See Halliburton*, 710 F.3d at 180 (collecting cases).   And some courts have found that the WSLA specifically applies to civil relator-initiated FCA claims brought under § 3730(b). *See, e.g.*, *id.* at 181; *Wells Fargo Bank*, 2013 WL 5312564, at *14; *Stryker Corp.*, 2013 WL 2666346, at *15.   *But see U.S. ex rel. Bergman v. Abbot Labs.*, — F. Supp. 2d —, 2014 WL 348583, at *16 (E.D. Pa. Jan. 30, 2014) (holding that "the WSLA does not toll the FCA's statute of limitations for relators without the government's intervention, especially when those cases do not involve military or war-related contracts"); *U.S. ex rel. Emanuele v. Medicor Assocs.*, No. 10-CV-245, 2013 WL 3893323, at *7 (W.D. Pa. July 26, 2013) (holding that the WSLA does not apply to relator-initiated FCA claims, especially "where the United States is not a party").

Plaintiff's FCA retaliation claim is materially different, however, from a relator-initiated FCA claim.   Under the statutory provision authorizing the latter claim, the relator brings the claim "for the person *and* for the United States Government."   31 U.S.C. § 3730(b)(1).

Moreover, "[t]he action shall be brought in the name of the Government," and it "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." *Id.* After the relator files the claim, "[t]he Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information." *Id.* § 3730(b)(2). Finally, if the Government elects to proceed with the action, "the action shall be conducted by the Government." *Id.* § 3730(b)(4)(A). By contrast, under the statutory provision authorizing an FCA retaliation claim, the employee brings the claim on his or her own behalf and in his or her own name, and the Government has no right to receive notice of the claim and no right to intervene on its own or on the employee's behalf. *See* 31 U.S.C. § 3730(h)(1). In other words, whereas a relator-initiated FCA claim is a claim brought on behalf of the United States, an FCA retaliation claim is a personal or private cause of action brought on behalf of the individual. *See U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 851 (7th Cir. 2009) (distinguishing between the plaintiff's "personal claim under § 3730(h) and [the] *qui tam* claim" brought under § 3730(b)); *Onnen v. Sioux Falls Indep. Sch. Dist. #49-5*, No. 07-CV-4174, 2011 WL 691620, at *5 (D.S.D. Feb. 18, 2011) (same). Given these distinctions, stretching the WSLA to apply to FCA retaliation actions would not further the purpose of the WSLA, as it has been interpreted by courts that have applied the WSLA to relator-initiated FCA claims. *See Halliburton*, 710 F.3d at 179 ("The purpose of the WSLA [is] to combat fraud at times when the United States may not be able to act as quickly because it is engaged in 'war' . . . ."); *Wells Fargo Bank*, 2013 WL 5312564, at *14 ("The WSLA serves not only to allow the Government to combat fraud related to wartime procurement programs, but also to give the government sufficient time to investigate and prosecute pecuniary frauds of any kind committed while the nation is distracted by the demands of war." (internal

quotation marks and alterations omitted)); *cf. Bridges*, 346 U.S. at 222 ("The purpose of the [WSLA] is not that of generally suspending the three-year statute [of limitations] . . . in cases of perjury, larceny and like crimes.  It seeks to suspend the running of it only where fraud against the Government is an essential ingredient of the crime.  In view of the opportunity to commit such frauds in time of war, and in view of the difficulty of their prompt discovery and prosecution, the Government seeks extra time to deal with them.").

But the primary reason the Court holds that the WSLA does not apply to FCA retaliation claims is based on the language of the statute itself.  As discussed, the provision applying to offenses "involving fraud or attempted fraud against the United States" applies only "to offenses . . . in which defrauding or attempting to defraud the United States is an essential ingredient of the offense charged."  *Wells Fargo Bank*, 2013 WL 5312564, at *12 (internal quotation marks omitted) (citing *Bridges*, 346 U.S. at 221).  To bring an FCA retaliation claim under § 3730(h), a plaintiff must allege "(1) that he engaged in conduct protected under the statute, (2) that defendants were aware of his conduct, and (3) that he was terminated in retaliation for his conduct."  *U.S. ex rel. Sarafoglou v. Weill Med. Coll. of Cornell Univ.*, 451 F. Supp. 2d 613, 624 (S.D.N.Y. 2006) (internal quotation marks omitted).  As amended in 2009, the FCA protects two kind of conduct: (1) "lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under [the FCA], and (2) "other efforts to stop [one] or more violations of [the FCA]."  31 U.S.C. § 3730(h)(1); *see also Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847–48 (7th Cir. 2012) ("Section 3730(h)(1) protects two categories of conduct.  The statute has long prevented employers from terminating employment for conduct that is 'in furtherance of an action under this section.' . . . .  In 2009, Congress amended the statute to protect employees from being fired for undertaking 'other efforts to stop' violations of the Act, such as reporting

suspected misconduct to internal supervisors.").  However, to allege either of these types of

protected conduct, a plaintiff need not allege that the defendant actually defrauded or attempted

to defraud the United States; instead, a plaintiff may state an FCA retaliation claim even if the

defendant's conduct would not have violated the FCA.  *See Graham Cnty. Soil & Water*

*Conservation Dist.*, 545 U.S. at 416 & n.1 (noting that § 3730(h)'s language "protects an

employee's conduct even if the target of an investigation or action to be filed was innocent," and

that "proving a violation of [the FCA] is not an element of a § 3730(h) cause of action");

*Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004) ("[T]he relevant inquiry to

determine whether an employee's actions are protected under § 3730(h) is whether: (1) the

employee in good faith *believes*, and (2) a reasonable employee in the same or similar

circumstances *might believe*, that the employer is committing fraud against the government."

(internal quotation marks omitted) (emphasis added)); *U.S. ex rel. Sasaki v. N.Y. Univ. Med. Ctr.*,

No. 05-CV-6163, 2012 WL 220219, at *12 (S.D.N.Y. Jan. 25, 2012) ("[A] relator need not

prevail on his or her FCA claim in order to recover for retaliation under [§ 3730(h)].  However, a

relator is required to show a 'good faith basis', [sic] or 'objectively reasonable basis', [sic] for

believing that he or she was investigating matters in support of a viable FCA case." (citation

omitted)); *cf. Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (holding, in the

context of the Americans with Disabilities Act, that a plaintiff "may prevail on a claim for

retaliation even when the underlying conduct complained of was not in fact unlawful so long as

he can establish that he possessed a good faith, reasonable belief that the underlying challenged

actions of the employer violated the law" (internal quotation marks and alterations omitted)).

The Court therefore holds that the WSLA does not apply to FCA retaliation claims, because

fraud is not an "essential ingredient" of such claims.  *See Bridges*, 346 U.S. at 222 (holding that

the WSLA did not apply to a charge where "fraud [was] not an essential ingredient" because "[t]he offense [would be] complete without proof of fraud, [even if] fraud often accompanies it").  Accordingly, Plaintiff may not rely on the WSLA to toll the statute of limitations for his FCA retaliation cause of action.

### 2.  Section 1983 Claims

The Complaint alleges a number of claims under § 1983.  Defendants argue that, like Plaintiff's FCA claim, his § 1983 claims are barred by a similar three-year statute of limitations. In his Memorandum of Law, Plaintiff argued that his claims were timely under the statute as it generally applies to such claims.  Then, as discussed, Plaintiff later argued that New York's Governor tolled the limitations period as part of his disaster-relief efforts in response to Hurricane Sandy.  The Court need not address any of these arguments because it finds that, even if the claims were timely, the Complaint fails to state a § 1983 claim.

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right."  *Sykes v. Bank of Am.*, 723 F.3d 399, 405–06 (2d Cir. 2013).  Here, Plaintiff alleges that Defendants deprived him of three constitutional rights when they terminated him.  First, he alleges that Defendants violated his First Amendment right to free speech, as applied to the states through the Fourteenth Amendment, because they terminated him based on his use of work computers to view websites with objectionable content.  Second, he alleges that Defendants violated his Fourteenth Amendment right to procedural due process because they terminated him without providing him an opportunity to respond to the allegations of misconduct.  Third, he alleges that Defendants violated his Fourteenth Amendment right to the equal protection of the laws because they

terminated him based on his sexual orientation.  Defendants move the Court to dismiss all three claims.

### a.  First Amendment Claim

Plaintiff first argues that his termination is actionable under § 1983 because Defendants violated his First Amendment right to free speech, as applied to the states through the Fourteenth Amendment.  *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996) (holding that a state violated the First Amendment "as made applicable to the States by the Due Process Clause of the Fourteenth Amendment").  The Complaint generally alleges that Defendants "unconstitutionally interpret[ed] and appl[ied] to [Plaintiff] the computer-use policies that by their own terms define prohibited uses and limit the scope of their own applicability."  (Compl. ¶ 35.)  Plaintiff specifically alleges that, during March 2009, and "with respect to [Plaintiff's] use of the computer and Internet access provided by the County," Defendants "surveilled [Plaintiff's] and others' computer and Internet use discriminatorily[] on the basis of the content of the Internet sites visited," which content Plaintiff alleges was "perfectly legal gay male sexual content."  (*Id.* ¶¶ 29(d), 29(d)(1).)  Plaintiff further alleges that Defendants Zugibe and Fortunado "reprimanded [Plaintiff] in May 2009" for violating the computer-usage policy, (*id.* ¶ 29(d)), but that those Defendants "abandoned th[e] allegations about [Plaintiff's] March 2009 computer and Internet use until after August 28, 2009, when . . . they intentionally, maliciously, and retaliatorily resuscitated those allegations as one of the series of active, systematic steps that they took in pursuance of the conspiracy to retaliate against [Plaintiff] for his lawful activity to stop the [alleged] violations of the FCA," (*id.* ¶ 29(e)).

"To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant[s'] actions were motivated or substantially

caused by his exercise of that right; and (3) the defendant[s'] actions caused him some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). Here, Plaintiff has not met the first requirement because he has not alleged a violation of a right protected by the First Amendment.

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *see also Melzer v. Bd of Educ. of City Sch. Dist.*, 336 F.3d 185, 192 (2d Cir. 2003) ("[T]he government may impose restrains on the First Amendment activities of its employees that are job-related even when such restraints would be unconstitutional if applied to the public at large."). Moreover, "[u]nderlying [the Supreme Court's] cases has been the premise that while the First Amendment invests employees with certain rights, it does not empower them to constitutionalize the employee grievance." *Garcetti*, 547 U.S. at 420 (internal quotation marks omitted). Thus, where a public employee alleges a violation of his or her right to free speech, "the First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if the employee speaks as a citizen on a matter of public concern." *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (internal quotation marks and alterations omitted). "To constitute speech on a matter of public concern, an employee's expression must be fairly considered as relating to any matter of political, social, or other concern to the community." *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (internal quotation marks omitted). By contrast, "[s]peech that, although touching on a topic of general importance, primarily concerns an issue that is personal in nature and generally related to the speaker's own situation . . . does not address matters of public concern." *Id.* (internal quotation marks and alterations omitted). Finally, "whether a public employee spoke . . . on a matter of public concern is a question of law" that the Court may resolve on a motion to dismiss. *Singer*, 711

F.3d at 339; *see also City of San Diego, Cal. v. Roe*, 543 U.S. 77, 84 (2004) (per curiam) (affirming district court's dismissal of a First Amendment claim on a motion to dismiss after finding that the plaintiff's expression "[did] not qualify as a matter of public concern").

Here, the Complaint fails to allege any kind of protected speech that addresses a matter of public concern.  The Supreme Court has "extended First Amendment protection only to conduct that is inherently expressive."  *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006).  Although the Complaint references "[Plaintiff's] expressive and associational activity visiting [web]sites," (Compl, ¶ 29(d)(1)), it contains no details or factual allegations that would allow the Court to accept this allegation of "expressive and associational activity" as anything more than conclusory.  Plaintiff does not, for example, allege that he was terminated for posting content on any websites.  *See Farah v. Esquire Magazine*, 736 F.3d 528, 539 (D.C. Cir. 2013) (applying First Amendment protection to a blog post and related comments); *Bonneau v. State Univ. of N.Y. at Brockport*, No. 11-CV-6273, 2013 WL 6633748, at *8 (W.D.N.Y. Dec. 17, 2013) (acknowledging that blog posts can be protected speech).  And he does not allege, more generally, that he was terminated for using the Internet to communicate in any way about these websites (or any other matter).  *See Doninger v. Niehoff*, 527 F.3d 41, 49 (2d Cir. 2008) (noting that "blog postings, instant messaging, and other forms of electronic communication" are "expressive activity" for First Amendment purposes).  Instead, Plaintiff alleges merely that he "visited" these websites.  (*See* Compl. ¶¶ 29(d)(1), 30(c), 32.)  This allegation, alone, does not implicate speech on a matter of public concern.  *See Connick v. Myers*, 461 U.S. 138, 147 (1983) ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to

review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."); *Dible v. City of Chandler*, 515 F.3d 918, 927 (9th Cir. 2007) (finding that a public employee, who ran a website featuring sexually explicit images of his wife, "did not contribute speech on a matter of public concern" where his speech "did not give the public any information about the operations, mission or function of the [public employer], and [was] not even close to the kind of private remarks that the [Supreme] Court has countenanced," but was instead "simply vulgar and indecent"); *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 105–06 (2d Cir. 2001) ("[W]hen expression cannot be fairly considered as relating to any matter of political, social or other concern to the community, but is simply a personal matter, it is not afforded First Amendment protection." (internal quotation marks omitted)); *Urofsky v. Gilmore*, 216 F.3d 401, 409 (4th Cir. 2000) (en banc) ("The essence of [the plaintiffs'] claim is that they are entitled to access sexually explicit material in their capacity as state employees by using equipment owned or leased by the state.  Because . . . the challenged aspect of the [speech regulation] does not affect speech by [the plaintiffs] in their capacity as private citizens on matters of public concern, it does not infringe the First Amendment rights of state employees."); *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993) (finding no speech involving a matter of public concern where the plaintiff's speech was "personal in nature and generally related to her own situation" and where her speech was "motivated by and dealt with her individual employment situation" (internal quotation marks omitted)); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1058 (2d Cir. 1993) (recognizing that "commercial" speech and speech involving "personal desire[s]" are categories of speech "less likely than others to involve matters of public concern"); *cf. City of San Diego, Cal. v. Roe*, 543 U.S. 77, 84 (2004) (per curiam) (holding that public employee's production, marketing, and selling of "sexually

explicit" videos "[did] not qualify as a matter of public concern under any view of the public concern test" while noting that "[t]he speech in question was detrimental to the mission and functions of the employer"); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 466 (1995) (finding that a public employee spoke on a matter of public concern where the speech "[was] addressed to a public audience, [was] made outside the workplace, and involved content largely unrelated to . . . government employment"). Therefore, even if Plaintiff could make out a case that he was terminated because of his accessing such websites, he would not have established a First Amendment claim. Accordingly, the Court dismisses Plaintiff's § 1983 claim based on an alleged First Amendment violation.

### b.  Procedural-Due-Process Claim

Plaintiff next argues that his termination is actionable under § 1983 because it violated his Fourteenth Amendment right to procedural due process. Plaintiff alleges that a number of "procedural safeguards and protocols provided by the Civil Service Law, the County's Civil Service Rules, . . . the RAM contract, [and] the computer-use polic[ies]" were "designed to protect [Plaintiff] against illegal retaliation and against deprivation of [his] employment." (Compl. ¶ 36(b).)  And he alleges that Defendants violated these procedural safeguards and protocols in a number of ways, including "solicit[ing] and acquir[ing] . . . adverse information or materials regarding [Plaintiff] for disciplinary purposes . . . without first notifying him of their existence and affording him a meaningful and timely opportunity . . . to challenge their acquisition and maintenance"; "us[ing] . . . information and . . . materials" to take adverse action against Plaintiff "without first notifying him and affording him a meaningful and timely opportunity . . . to challenge that [adverse action]"; "systematically prevent[ing] [Plaintiff] from learning about and defending against" his termination; and "summon[ing] [Plaintiff], without any

notice whatsoever, to Zugibe's office" while "achieving maximum surprise and coercive effect on [Plaintiff]," and thereby "nullifying his ability to defend himself on the spot and thus readily obtaining from him the resignation letter" that resulted in his termination.  (*Id.* ¶¶ 36(b)(1)–(8).)  Essentially, therefore, Plaintiff alleges that he had a "valuable contract and property right" in his employment, and that, in the process of terminating him, Defendants "deprived [him] of that employment without due process of law."  (*Id.* ¶¶ 36(a)–(b).)

"A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process."  *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012); *Jones v. City of New York*, No. 12-CV-9144, 2013 WL 4028183, at *6 (S.D.N.Y. Aug. 8, 2013) (same).  Here, Plaintiff's claim fails under the second element, because, notwithstanding Defendants' alleged violation of various procedural safeguards and protocols, the State has provided other procedures that protect Plaintiff's protectable interests in the face of those violations.

"Due process does not, in all cases, require a hearing before the state interferes with a protected interest, so long as some form of hearing is provided before an individual is finally deprived of the property interest."  *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (internal quotation marks and alterations omitted).  Where a plaintiff claims that he was denied a pre-deprivation hearing in the context of a "coerced resignation," "it is hard to visualize what sort of prior hearing the Constitution would require the employer to conduct," because "[a] coerced resignation does not involve a showing of cause," and thus "[i]f there is no factual dispute between the employer and the employee, a hearing is meaningless."  *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984); *see also Fortunato v. Liebowitz*, No. 10-CV-2681, 2012 WL 6628028, at *5 (S.D.N.Y. Dec. 20, 2012) ("Subsequent decisions have followed *Giglio* and held

that the availability of a post-deprivation hearing in a case where a plaintiff alleges a coerced

resignation satisfies the requirements of due process.") (collecting cases).  In this context, "due

process is satisfied so long as the government provides a neutral adjudicator at [a] post-

termination hearing." *Locurto v. Safir*, 264 F.3d 154, 171, 173 (2d Cir. 2001) (dismissing a

procedural-due-process claim based on allegations that defendants had "predetermined to fire

plaintiffs form the outset, prior to any administrative hearings").

For state employees in New York, "[a]n Article 78 proceeding . . . constitutes a wholly

adequate post-deprivation hearing for due process purposes." *Locurto*, 264 F.3d at 175.  This is

true "even though the petitioner [in an Article 78 proceeding] may not be able to recover the

same relief that he could in a § 1983 suit." *Hellenic Am. Neighborhood Action Comm. v. City of

New York ("HANAC")*, 101 F.3d 877, 881 (2d Cir. 1996).  And it is true even if a plaintiff

cannot initiate an Article 78 proceeding outside of Article 78's four-month statute of limitations.

*Id.*; *see also Mordukhaev v. Daus*, No. 09-CV-5149, 2010 WL 3792044, at *7 (S.D.N.Y. Aug.

19, 2010) ("A plaintiff's failure to commence an Article 78 proceeding within the four-month

limitations period does not prevent this Court from taking into account the availability of such

when determining whether he has been afforded due process.").  "Where, as here, Article 78

gave the employee a meaningful opportunity to challenge the voluntariness of his resignation, he

was not deprived of due process simply because he failed to avail himself of the opportunity."

*Giglio*, 732 F.2d at 1135.

Plaintiff argues that the Complaint states a procedural-due-process claim for three

reasons, none of which is availing.  First, he argues that he was not required to "exhaust" his

claim.  (*See* Opp'n 28.)  The Second Circuit agrees, and yet it has still held that a plaintiff has no

procedural-due-process claim under § 1983 where an adequate post-deprivation remedy in the

form of an Article 78 proceeding is *available* to a plaintiff, regardless of whether the plaintiff

actually took advantage of that procedure.  As the Second Circuit has explained,

> [The plaintiff] can find little comfort in the general rule that § 1983 allows plaintiffs
> with federal or constitutional claims to sue in federal court without first exhausting
> state judicial or administrative remedies.  Our decisions holding that an Article 78
> proceeding constitutes an adequate postdeprivation procedure under the Due
> Process Clause are consistent with this general rule.  If there *is* a constitutional
> violation, federal courts are available to hear § 1983 suits despite the availability of
> adequate state procedures.  [The Supreme Court], however, [has] emphasize[d] that
> there *is no* constitutional violation (and no available § 1983 action) when there is
> an adequate state postdeprivation procedure to remedy a random, arbitrary
> deprivation of property or liberty.

*HANAC*, 101 F.3d at 881–82 (citations omitted).

Second, Plaintiff argues that Defendants' denial of pre-deprivation procedures was not

"random," but was instead part of a "structured" effort to terminate him.  (*See* Opp'n 28–29.)

But the Second Circuit has held that "the question of [whether a deprivation was] 'random and

unauthorized,'" or whether it was pursuant to "established government procedures," is "moot" in

the context of a public employee's wrongful-termination claim, because "the state affords

plaintiff[s], subsequent to . . . termination, a full adversarial hearing before a neutral adjudicator"

in the form of an Article 78 proceeding—which, the Second Circuit has noted, allows a

petitioner specifically to "raise claims that the [employer] was biased and prejudged the

outcome" of the termination process.  *Locurto*, 264 F.3d at 172–74.

Finally, Plaintiff argues that Defendants prevented him from utilizing Article 78 as a

post-deprivation procedure because they "studiously deprived [him] of the evidentiary

wherewithal to initiate such [a] proceeding until . . . long after its [four]-month statute of

limitations had expired."  (Opp'n 29.)  But, again, although the Complaint alleges that

Defendants collected, maintained and used information against Plaintiff "without . . . affording

him a meaningful and timely opportunity . . . to challenge" those actions in an Article 78

proceeding, (Compl. ¶¶ 36(b)(2)–(3)), it does not allege any facts supporting this conclusory allegation.  The Complaint does not contain a single allegation addressing the specific "evidentiary wherewithal" that Plaintiff did not have and that was necessary to initiate an Article 78 proceeding.  In Plaintiff's Memorandum of Law, he asserts that "[D]efendants secreted meaningful documentation" until April 29, 2010 (which, Plaintiff notes, was after the expiration of the Article 78 statute of limitations), when their attorney "disclosed to [Plaintiff] for the first time crucial documentation necessary to pursue" his remedies.  (Opp'n 13 n.23.)  But even if the Court could take the Memorandum's allegation into account when determining whether the Complaint states a procedural-due-process claim, it would still dismiss the claim because, even in the Memorandum, Plaintiff has not explained why the documentation was "crucial" and "necessary" to file an Article 78 petition.  Indeed, other allegations in the Complaint undermine this claim, as Plaintiff alleges separately that, before he had access to these documents, he won an administrative proceeding for unemployment benefits wherein he convinced the adjudicator that his termination was not voluntary and was not justified for misconduct.  (*See* Compl. ¶ 19.)  Moreover, Article 78 petitions are held to notice-pleading standards similar to those applicable to this Complaint, such that Plaintiff could have filed a petition with allegations supported by facts known to him even if he did not have the "evidentiary wherewithal" he claims he was denied.  *See Pettus v. N.Y. State Dep't of Corr. Servs.*, 908 N.Y.S.2d 373, 373 (App. Div. 2010) (holding that, to withstand a motion to dismiss, pleadings in an Article 78 proceeding must "'be sufficiently particular to give the court and parties *notice* of the transactions, occurrences, or series of transactions or occurrences, *intended to be proved* and the material elements of each cause of action or defense'" (emphasis added) (quoting N.Y. C.P.L.R. § 3013)); *Abreu v. Hogan*, 897 N.Y.S.2d 773, 774 (App. Div. 2010) (same); *cf. Wells Fargo Bank, N.A. v. Mastromarino*,

950 N.Y.S.2d 383, 383 (App. Div. 2012) ("On a motion to dismiss [an Article 78] pleading . . .

all of the allegations in the pleading are deemed true and afforded the benefit of every favorable

inference.").  The Court therefore grants Defendants' Motion To Dismiss Plaintiff's procedural-

due-process claim because the Complaint does not allege that Plaintiff was denied process that

was available to him or that he was otherwise due.

c.  Equal Protection Claim

Plaintiff finally argues that his termination is actionable under § 1983 because

Defendants disciplined and terminated him based on his sexual orientation.  Plaintiff alleges that

Defendants discriminated against him in two ways.  First, he alleges discrimination "on the

arbitrary, irrational basis that the websites visited in March 2009 by [Plaintiff] contained or

evidenced [Plaintiff's] interest in gay, male sexual . . . content."  (Compl. ¶ 32.)  Second, he

alleges discrimination on the basis of Plaintiff's membership in a class of gay males.  (*See id.*

¶ 32(a); *see also id.* ¶ 32(c) ("[T]he only basis for the difference between the disciplinary

treatment accorded by Zugibe and Fortunato to [Plaintiff] and the disciplinary treatment

accorded to those other similarly situated employees, was [Plaintiff's] known gay sexual

orientation and the gay male sexual content of the web sites he searched.").)

To state a claim under the Equal Protection Clause, a plaintiff may either "alleg[e]

discrimination based on membership in a protected class," or allege a "class of one" claim.  *See*

*Neislon v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds by Appel v.*

*Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008); *see also Martine's Serv. Ctr., Inc. v. Town of*

*Wallkill*, No. 07-CV-6327, 2013 WL 1248628, at *3 (S.D.N.Y. Mar. 26, 2013) ("A plaintiff who

does not claim membership in a protected class may still set for a 'class of one' claim . . . .");

*T.K. v. N.Y.C. Dep't of Educ.*, 779 F. Supp. 2d 289, 316 (E.D.N.Y. 2011) ("[An equal protection]

35

claim may be the result of membership in a protected class or result from an individual being a member of a class of one.").  Here, Plaintiff's first allegation of discrimination—that Defendants discriminated against Plaintiff because of his use of work computers to visit certain websites— appears to state the latter type of claim, "where [a] plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  The Supreme Court, however, has held that "the class-of-one theory of equal protection has no application in the public employment context."  *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 607 (2008); *see also id.* at 609 ("Public employees typically have a variety of protections from [certain] personnel actions . . . , but the Equal Protection Clause is not one of them."); *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) ("The Supreme Court's decision in [*Engquist*] eliminated class-of-one claims for government employees.").  Therefore, the Complaint fails to state an Equal Protection claim based on this theory.

Alternatively, the Supreme Court has recognized that "the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently."  *Engquist*, 553 U.S. at 605.  To state a claim for discriminatory discharge under a protected-class theory, a plaintiff must allege "(1) that he belongs to a protected class; (2) that he was performing his duties satisfactorily; (3) that he was discharged; and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class."  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994); *see also Chick v. Cnty. of Suffolk*, — F. App'x —, 2013 WL 6332682, at *1 (2d Cir. Dec. 6, 2013) (applying this test to affirm a district court's grant of a motion to dismiss a § 1983 Equal Protection claim alleging discriminatory discharge

and hostile work environment).  Moreover, for the purposes of this analysis, "the core

substantive standards that apply to claims of discriminatory conduct in violation of Title VII [of

the Civil Rights Act of 1964] are also applicable to claims of discrimination in employment in

violation of . . . the Equal Protection Clause."  *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206,

225 (2d. Cir. 2004).

Here, Plaintiff has failed to plead facts "giving rise to an inference of discrimination on

the basis of his membership in [a protected] class."[7]  *Chambers*, 43 F.3d at 37.  Absent direct

evidence demonstrating discriminatory intent, which Plaintiff has not alleged, "[a] plaintiff may

support an inference of . . . discrimination by demonstrating that similarly situated employees

[not in the protected class] were treated more favorably."  *Norville v. Staten Island Univ. Hosp.*,

196 F.3d 89, 95 (2d Cir. 1999).  "To be 'similarly situated,' the individuals with whom [a

plaintiff] attempts to compare [him]self must be similarly situated in all material respects."

*Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).  And to be similarly

situated in "all material respects" in the context of the Complaint, Plaintiff must "show that

similarly situated employees who went undisciplined engaged in comparable conduct."  *Graham

v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000); *see also McGuinness v. Lincoln Hall*, 263

F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish [his] minimal prima facie case

by making reference to the disparate treatment of other employees, those employees must have a

situation sufficiently similar to plaintiff's to support at least a minimal inference that the

---

[7] Because the Court dismisses Plaintiff's claim based on this factor, it is unnecessary to
address whether the Complaint satisfies the other factors.  However, the Court notes that the
Second Circuit has held that "homosexuals compose a class that is . . . . quasi-suspect," and that
allegations of discrimination involving this class are "subject to heightened scrutiny."  *Windsor
v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd on other grounds*, 133 S. Ct. 2675
(2013).

difference of treatment may be attributable to discrimination."); *Jackson v. City of New York*, No. 11-CV-3028, 2014 WL 1010785, at *6 (E.D.N.Y. Mar. 17, 2014) (holding that the plaintiff "fail[ed] to identify any similarly situated employees who were not comparably disciplined for substantially the same conduct that [the] [p]laintiff engaged in, or was accused of engaging in"); *McLaughlin v. New York*, No. 11-CV-1242, 2013 WL 3915183, at *7 (S.D.N.Y. July 30, 2013) (applying *Graham*).  The conduct need not be "identical," but there must be a "reasonably close resemblance of the facts and circumstances of [the] plaintiff's and [the] comparator's cases," such that "the conduct for which the employer imposed discipline was of comparable seriousness" to the conduct of the similarly situated but undisciplined employees.  *Graham*, 230 F.3d at 40; *see also Kugler v. Donahoe*, No. 11-CV-648, 2014 WL 1010317, at *10 (E.D.N.Y. Mar. 17, 2014) (applying *Graham* and noting that "[t]he employees' situations need not be identical, but must closely resemble each other"); *Taylor v. Seamen's Soc'y for Children*, No. 12-CV-3713, 2013 WL 6633166, at *14 (S.D.N.Y. Dec. 17, 2013) ("What constitutes 'all material respects' varies, of course, from case to case, but 'the plaintiff and those [he] maintains were similarly situated [must have been] subject to the same workplace standards[,]' . . . . [which] requires 'a reasonably close resemblance of facts and circumstances.'" (second alteration in original) (quoting *Graham*, 230 F.3d at 40)).  Moreover, although, "[a]t the motion to dismiss stage, . . . evidence [of similarly situated comparators] is not necessary[,] . . . a court still must determine whether, based on a plaintiff's allegations in the complaint, it is plausible that a jury could ultimately determine that the comparators are similarly situated."  *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011); *see also Watson v. Geithner*, Nos. 09-CV-6624, 10-CV-3948, 10-CV-7282, 2013 WL 5420932, at *10 (S.D.N.Y. Sept. 27, 2013) ("Whether employees are similarly situated is ordinarily a question of fact;

however, if there are many distinguishing factors between plaintiff and the comparators, the court may conclude as a matter of law that they are not similarly situated." (internal quotation marks omitted)).  "Thus, well-pled facts showing that the plaintiff has been treated differently from others similarly situated remains an essential component of such a claim and conclusory allegations of selective treatment are insufficient to state an equal protection claim."  *Mosdos Chofetz Chaim*, 815 F. Supp. at 698.

The Complaint alleges that Defendants terminated Plaintiff based, in part, on his violation of computer- and internet-usage policies, but that other employees, who were "similarly situated to [Plaintiff], except that they were not gay males," were not disciplined for similar violations. (*See* Compl. ¶ 32(a).)  The Complaint suggests a number of examples of his co-workers' undisciplined violations, including using the computers to access "various non-county-business-related web-sites," "to conduct outside moonlighting law practices in broad daylight on County time," and "to engage in personal and social activities, joke-telling and photo swapping, lottery and games, job searches, political research and political activity, travel planning, sporting events and recreation, concerts and movies, nonprofit fundraising, recreation and family health matters, civil-service test preparation, wedding- and baby-shower planning and other activities . . . unrelated to County business."  (*Id.* ¶ 32(a).)  Even if all of these examples violated the computer- and internet-usage policy, however, none satisfies Plaintiff's burden to plead that Defendants did not take adverse employment action against a similarly situated employee who was not a member of a protected class, because Plaintiff's conduct—viewing sexually explicit materials—is not of "comparable seriousness" to these examples.  *See Glenwright v. Xerox Corp.*, 832 F. Supp. 2d 268, 275 (W.D.N.Y. 2011) (finding that the plaintiffs, who were terminated for using work computers to store, view, and transmit pornographic materials, failed

to identify similarly situated employees where the identified employees did violate company computer-usage policies regarding pornographic materials but the violations were less "serious" and there were "mitigating circumstances distinguishing [the] conduct and the various levels of discipline"); *Marro v. Nicholson*, No. 06-CV-6644, 2008 WL 699506, at *10 (E.D.N.Y. Mar. 12, 2008) (holding, as a matter of law, that "employees that generally misuse [a] computer are [not] similarly situated to those who use a computer in connection with sexually explicit or pornographic material"); *Trnka v. Biotel Inc.*, No. 07-CV-1206, 2008 WL 108995, at *4 (D. Minn. Jan. 9, 2008) ("[The plaintiff] . . . argues that other employees used company e-mail for personal use and to distribute jokes, but that those employees were not terminated. . . . Yet, [the plaintiff's] employment was terminated not only because she used e-mail to send jokes and personal messages, but also because she sent *sexually inappropriate* messages from her work computer.  She has proffered no evidence indicating that other employees were using their work e-mail to send sexually explicit messages.  Accordingly, she has failed to identify any other employees who were 'similarly situated' to her."); *LeViness v. Bannon*, No. 99-CV-1647, 2001 WL 1580278, at *3 (D. Conn. Dec. 6, 2001) (granting motion to dismiss where the plaintiff offered "no allegation that any of the[] five [comparators] were subject to the same disciplinary rules, employment policies, or code of conduct as was the plaintiff," nor any allegation that the comparators had "disciplinary records similar to the plaintiff's").  In addition to these examples, the Complaint alleges that similarly situated employees used work computers to access websites "along . . . categories [such as] . . . 'shopping' or 'entertainment' or 'adult/sexually explicit' or 'society & culture', [sic] 'health & medicine' or 'personal finances' or 'personals & dating' or 'job search & career development' or 'travel' or[] [']politics.'"  (Compl. ¶ 32(a).)  This allegation, however, directly references a separate part of the Complaint wherein Plaintiff alleges

40

that, in response to Plaintiff's request for County records of employee computer usage, the County declined to provide the records but indicated that, if produced, they would show computer usage of certain employees and would "categoriz[e] such user activity for such personal, political, sexual, or other . . . non-County-business-purposes as 'shopping' or 'entertainment' or 'adult/sexually explicitly' or 'society & culture', [sic] 'health & medicine' or 'personal finances' or 'personals & dating' or 'job search & career development' or 'travel' or[] [']politics.'"  (*Id.* ¶ 29(d)(3).)  In other words, the Complaint does not identify any particular employee who used work computers to access "adult/sexually explicit" material.  Rather, it alleges that this is one of the many "categories" of computer usage that the County tracks—an allegation that, by itself, does not satisfy Plaintiff's burden to allege that there were employees other than Plaintiff who fell into this category.[8]  The Complaint therefore fails to state a § 1983 claim for a violation of the Equal Protection Clause because it fails to allege facts "giving rise to

---

[8] In attempting to remedy this defect in his Memorandum of Law, Plaintiff further weakens his ability to state a claim.  In a table comparing Defendants' treatment of Plaintiff to "other employee[s]" not "known [to be] gay" based on various types of conduct, Plaintiff alleges that Defendants "punished" both Plaintiff *and* other employees for "gay sexually explicit usage [that is] legal but forbidden by [the] County Computer Use Policy."  (Opp'n 27 (some alterations omitted).)  If this allegation were true, then Plaintiff has not alleged that he was treated differently from similarly situated employees.  Moreover, although Plaintiff alleges that he was "punished" for "gay sexually explicit usage," he also alleges that, like "other employee[s]," he was "not punished" for "other sexually explicit usage" and "other non-sexual usage" that is "legal but forbidden by [the] County Computer Use Policy."  (*Id.* (some alterations omitted).)  Again, Plaintiff appears to allege that he was treated the same as similarly situated employees who accessed the same kind of websites.  If anything, therefore, Plaintiff alleges in his Memorandum that Defendants discriminated against him, not because he was a member of a protected class, but because he used a work computer to visit a certain kind of website.  But, as the Court has explained, this at best states a claim for "class of one" discrimination—a claim that is not available in the public-employment context.  *See Engquist*, 553 U.S. at 607.  And, to the extent Plaintiff bases his equal protection claim on the argument that Defendants discriminated against him "to punish him for exercising his First Amendment rights," (Opp'n 27), the Court dismisses the claim for the same reasons it dismissed Plaintiff's § 1983 claim based on an alleged First Amendment violation.

an inference of discrimination on the basis of [Plaintiff's] membership in [a protected] class."
*Chambers*, 43 F.3d at 37.  Accordingly, the Court grants Defendants' Motion to dismiss this
claim.  *See Bishop v. Best Buy, Co.*, No. 08-CV-8427, 2010 WL 4159566, at *12 (S.D.N.Y. Oct.
31, 2010) (dismissing an equal protection claim because the plaintiff failed to allege any
similarly situated individuals who were treated differently); *Econ. Opportunity Comm'n of
Nassau Cnty. v. Cnty. of Nassau, Inc.*, 47 F. Supp. 2d 353, 370 (E.D.N.Y. 1999) (same); *see also
30 Clinton Place Owners Inc. v. City of New Rochelle*, No. 13-CV-3793, 2014 WL 890482, at *2
(S.D.N.Y. Feb. 27, 2014) (granting 12(b)(6) motion to dismiss a § 1983 equal protection claim
because the complaint failed to allege facts giving rise to inference of discrimination).

### 3.  Section 1985 Claim

The Complaint also alleges a claim under 42 U.S.C. § 1985(3), which establishes a cause
of action against parties who conspire to deprive a person of the equal protection of the laws.
*See* 42 U.S.C. § 1985(3); *see also Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d
Cir. 2007) ("In order to state a conspiracy claim under [§ 1985(3)], a plaintiff must show: (1) a
conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of
persons of the equal protection of the laws, or of equal privileges and immunities under the laws;
(3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or
property or deprived of any right or privilege of a citizen of the United States.").  As alleged,
however, this claim is entirely dependent on the allegations in his § 1983 claims.  (*See* Compl.
¶ 37 (alleging that defendants conspired "to deprive [Plaintiff] of his right to the equal protection
of the laws and of his right to due process guaranteed to him by the 14th Amendment . . . , as
well as of his right to freedom of speech, freedom of expression, and freedom of association,
guaranteed to him by the 1st and 14th Amendments").)  Because the Court has found that the

Complaint fails to state a § 1983 claim based on deprivations of the rights to equal protection, procedural due process, and free speech, it also finds that the Complaint fails to state a § 1985 claim based on a conspiracy to deprive Plaintiff of those same rights.  The Court thus dismisses Plaintiff's § 1985 claim.

### 4.  State Law Claims

The Complaint finally alleges a number of state-law claims arising under common law (second, eighth, and ninth causes of action) and New York's Human Rights Law, N.Y. Exec. Law § 296(1)(a) (fourth cause of action).  Because these claims do not present federal questions, *see* 28 U.S.C. § 1331, and because Plaintiff has not alleged that he is diverse with respect to Defendants, *see id.* § 1332, the Court may entertain these claims only pursuant to a theory of supplemental jurisdiction, *see id.* § 1367.

Where a court "has dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction" over any remaining claims.  *See id.* § 1367(c)(3). Because the Court has dismissed all of Plaintiff's claims arising under federal law without prejudice, it need not exercise its discretion to maintain supplemental jurisdiction over the state-law claims.  *See Matican v. City of New York*, 524 F.3d 151, 154–55 (2d Cir. 2008) ("[I]f [plaintiff] has no valid claim under § 1983 against any defendant, it is within the district court's discretion to decline to exercise supplemental jurisdiction over the pendent state-law claims."). For now, it suffices to say that the Court dismisses Plaintiff's state-law claims without prejudice to allow Plaintiff to amend his Complaint.  *See Nielsen v. Rabin*, — F.3d —, 2014 WL 552805, at *2 (2d. Cir. Feb. 13, 2014) ("Generally, leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim.  A *pro se* complaint should not be dismissed without the Court granting leave to

amend at least once when a liberal reading of the complaint gives any indication that a valid

claim might be stated." (internal quotation marks and citations omitted)).

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' Motion To Dismiss in full, and

dismisses the Complaint without prejudice. Plaintiff is given thirty days to submit an amended

complaint. The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt.

No. 18.)

SO ORDERED.

Dated:      March 31 , 2014
            White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE